**GULF POWER COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Florida Public Utilities Company, Intervenor.**

**No. 91–1354.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1992.

Decided Jan. 22, 1993.

Dan H. McCrary, with whom Rodney O. Mundy, Birmingham, AL, and G. Edison Holland, Jr., Pensacola, FL, were on the brief, for petitioner. Mark A. Crosswhite, Birmingham, AL, entered an appearance for petitioner.

Robert H. Solomon, Atty., F.E.R.C., Washington, DC, for respondent. William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol. and Thomas G. Lane, Atty., F.E.R.C., Washington, DC, were on the brief for respondent.

Thomas F. Brosnan and Andrea J. Chambers, Washington, DC, entered appearances for intervenor.

Before EDWARDS, RUTH BADER GINSBURG and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

## I. Statutory Background

Under the Federal Power Act (FPA or Act), 16 U.S.C. §§ 824 *et seq.*, a utility subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC) must file with FERC a schedule of the rates it intends to charge its customers. 16 U.S.C. § 824d(c), (d). FERC reviews the rates to ensure that they are "just and reasonable"; the Act makes any rates that fall short of the just and reasonable standard unlawful. 16 U.S.C. § 824d(a).

When a utility wishes to change the rates it charges its customers, it must provide FERC with 60 days notice and file new rate schedules. 16 U.S.C. § 824d(d). Under the statute, FERC may waive the notice requirement for good cause. *Id.* Ordinarily, however, upon receiving the proposed schedules, the Commission decides whether to hold hearings to determine the reasonableness of the new rates and it may suspend the imposition of the rates for as long as five months while it decides on their reasonableness. 16 U.S.C. § 824d(e).

In order to give a utility the flexibility to respond efficiently to market fluctuations in costs, the statute allows it to include automatic adjustment clauses in its rate schedules to provide for "increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility." 16 U.S.C. § 824d(f)(4). Under this provision, FERC countenances a utility's practice of including fuel adjustment clauses (FACs) in its rate schedules to allow it to adjust the rates automatically for the changing costs of fuel. *See* 18 C.F.R. § 35.14.

FERC permits a utility to include, as part of the FAC, the costs of "[f]ossil ... fuel consumed in the utility's own plants." 18 C.F.R. § 35.14(a)(2). These costs, however, "shall include no items other than those listed in Account 151...." 18 C.F.R. § 35.14(a)(6). Account 151 limits allowable fuel costs, in part, to "excise taxes, purchasing agents' commissions, insurance and other

expenses directly assignable to the cost of fuel." Account 151, 18 C.F.R. Part 101. Because, as it has recognized, FERC maintains less regulatory vigilance over the automatic adjustment clauses, it interprets narrowly the scope of costs a utility may include in the FAC. *See, e.g., Southern California Edison Co.*, 3 Fed.Energy Reg. Comm'n (CCH) ¶ 61,075 (1978); *Electric Cooperatives of Kansas*, 14 Fed.Energy Reg.Comm'n (CCH) ¶ 61,176 (1981); *Kansas City Power & Light Co.*, 42 Fed.Energy Reg.Comm'n (CCH) ¶ 61,249 (1988). It may, however, in its discretion, waive any of the regulations pertaining to the fuel adjustment clause. 18 C.F.R. § 35.19a.

## II. Procedural Background

In 1986, as a result of a changing fuel market, Gulf Power Company (Gulf) was a party to a series of expensive long term coal purchasing contracts. Instead of continuing to purchase high priced coal and passing the cost on to its customers, Gulf voluntarily renegotiated the contracts from late 1986 to early 1988. The renegotiations resulted in Gulf agreeing to pay approximately $250 million in buyout costs to its coal suppliers and entering into new contracts projected to save Gulf approximately $600 million in coal costs over the life of the contracts.

On January 1, 1987, after effecting its first buyout, Gulf began passing the savings on to consumers by reducing the cost of coal in its FAC. At the same time, Gulf also began passing through to its customers the amortized cost of the buyout. Gulf believed it could pass this cost on to customers because the buyout expenses constituted "other expenses directly assignable to the cost of fuel" under Account 151. *See* Account 151, 18 C.F.R. Part 101. Although Gulf's customers paid the buyout costs, the overall cost of fuel was still cheaper than before the buyout occurred; for Gulf's wholesale customers, the net savings from the buyout were estimated at $4.3 million over the life of the contracts.

Other utilities also engaged in this buyout strategy in the 1980s. Mississippi Power Company, an affiliate of Gulf,[1] participated in some of the same buyouts at issue in this case. While performing a routine audit of Mississippi Power in August 1987, FERC informed that utility that it needed a waiver to pass buyout costs through the FAC because those costs were not included in Account 151. Mississippi Power applied for such a waiver in September 1987. The Commission granted Mississippi's application and *sua sponte* made the waiver *retroactive* to January 1, 1987. *Mississippi Power*, 41 Fed.Energy Reg.Comm'n (CCH) ¶ 61,004 (1987).

In December 1988, FERC issued an order declaring that buyout costs fell outside the scope of Account 151 and thus could not be automatically included in the fuel adjustment clause. *Kentucky Utilities*, 45 Fed.Energy Reg.Comm'n (CCH) ¶ 61,409 (1988). Nonetheless, in *Kentucky Utilities* FERC indicated that it would grant a waiver from the FAC regulations and allow the pass through of buyout costs if the utility could demonstrate that the buyout provided "ongoing benefits" to its customers. *Id.* at 62,293.

In the spring of 1989, as the result of another routine audit, FERC discovered that Gulf had been passing through buyout costs for over two years. FERC then notified Gulf that it had to seek a waiver of notice and fuel adjustment clause requirements. Before filing for a waiver, Gulf obtained from all of its wholesale customers written consent to the pass through of the buyout costs. Gulf then filed a waiver request identical to the one Mississippi Power had filed two years earlier. The Commission rejected Gulf's waiver request because Gulf did not show that its buyout plan satisfied the ongoing benefits test of *Kentucky Utilities*. FERC letter of October 4, 1989 to Gulf, Gulf App. at 291.

In July 1990, Gulf filed a second waiver request in which it demonstrated compliance with *Kentucky Utilities*. In April

---

**1.** Mississippi Power Company and Gulf jointly own a coal-fired generating facility in Mississippi.

1991, FERC found that Gulf had satisfied the ongoing benefits test and granted a *prospective* waiver of the regulations (as of July 1990). In so doing, the Commission specifically noted that the present value of the savings from the buyouts substantially exceeded the buyout costs passed through the FAC. Moreover, FERC noted that Gulf had "proposed a detailed system of verifying savings ... and assuring that they are not exceeded by the costs of its contract terminations." *Gulf Power Co.*, 55 Fed.Energy Reg.Comm'n (CCH) ¶ 61,030 (1991). FERC declined, however, to grant Gulf a retroactive waiver. Thus, it ordered Gulf to refund to consumers, with interest, all payments Gulf had collected from January 1, 1987, until July 19, 1990, as a result of the pass through of buyout costs. Under protest, Gulf refunded $2.1 million in payments and $600,000 in interest to its customers. Gulf now petitions for review, claiming that FERC's refusal to grant a retroactive waiver was arbitrary and capricious. We agree that the penalty imposed on Gulf was excessive.

### III. Issues on Review

■ FERC denied the retroactive waiver because Gulf began to pass through its buyout costs under the FAC without first seeking a waiver of both the notice provisions and the FAC regulations. We agree with FERC that Gulf committed at least a ministerial error in failing to seek the waiver before it began to pass through the buyout costs, but we find that the sanction the Commission imposed was not rationally arrived at on this record and was wholly disproportionate to the error Gulf committed.

Account 151 permits utilities such as Gulf to include in the FAC the costs of "excise taxes, purchasing agents' commissions, insurance, and other expenses directly assignable to the cost of fuel." Account 151, 18 C.F.R. Part 101. Gulf contends, and we believe, that it operated before *Kentucky Utilities* under a good faith assumption that buyout costs constituted "other expenses directly assignable to the cost of fuel." *Id.* But in January 1987, when Gulf began its pass through, the permissibility of including those costs in the FAC without seeking a waiver was not as certain as Gulf thought. Buyout costs—the costs of getting out of an unprofitable contract—result from the utility's decision not to use the fuel it had contracted to purchase. One reasonable interpretation of Account 151 is that "other expenses directly assignable to the cost of fuel" incorporates costs related only to fuel *used* by the utility. This interpretation would exclude buyout costs from Account 151 and thus from the FAC. Even if Gulf did not consider this possibility, it should have been aware that the Commission had not taken an express position on whether buyout costs could be included in the FAC when Gulf began its pass through. In 1987, then, this issue appeared to fall at the least into a "gray area" in the FAC regulations. Nevertheless, given FERC's strict interpretation of those regulations, Gulf should have sought guidance from the agency before attempting to pass the buyout costs through the FAC.[2]

Any doubts about Gulf's action were resolved in December 1988 when the Commission decided that buyout costs were not assignable to Account 151 and thus could not be automatically included in the fuel adjustment clause. *Kentucky Utilities*, 45 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 61,-409 (1988). In *Kentucky Utilities*, as noted earlier, FERC indicated that a utility could nonetheless receive a waiver to pass through the buyout costs if it could demonstrate that the buyout provided "ongoing

---

**2.** The Commission has consistently warned utilities to seek guidance from it in making decisions about uncertain matters. "[W]hen utilities are uncertain about the applicability of the Commission's FAC requirements and elect to proceed without seeking Commission guidance, they do so at their own risk." *Illinois Power Company,* 52 Fed.Energy Reg.Comm'n Rep.

(CCH) ¶ 61,162 (1990); *Kentucky Utilities,* 45 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 61,409 (1988). *See also* 18 C.F.R. § 385.207(a) (initially appearing at 47 Fed.Reg. 19,022 (1982) and 49 Fed.Reg. 35,359 (1989)); 18 C.F.R. § 375.303(a) (initially appearing at 43 Fed.Reg. 36,435 (1978)).

benefits" for its customers.[3] *Id.* at 62,293. Thus, as of December 1988, Gulf should have known that it needed to apply for a waiver.

Nonetheless, Gulf continued to pass the buyout costs through to consumers without seeking a waiver until the spring of 1989 when, after conducting a routine audit, FERC informed Gulf that it needed one. It is clear that Gulf had a duty to apply for a waiver of the FAC regulations earlier than that. At the very least, it should have applied immediately following the *Kentucky Utilities* decision. While the record does not suggest that Gulf deliberately ignored the Commission's policy, Gulf's failure to seek a timely waiver constituted at least ministerial error.

■ The remedial sanction that FERC chose to impose on Gulf in this case, however, is wholly disproportionate to Gulf's error. We have acknowledged that "the difficult problem of balancing competing equities and interests has been given by Congress to the Commission with full knowledge that this judgment requires a great deal of discretion." *Columbia Gas Transmission Corp. v. FERC,* 750 F.2d 105, 109 (D.C.Cir.1984). Accordingly, we should not interfere with FERC's remedial discretion "so long as the agency's determination has a rational basis." *Id.*

■ To overcome the hurdle of deference, Gulf must demonstrate that "the agency acted arbitrarily by failing to give 'meaningful consideration' to the application." *United Gas Pipe Line Co. v. FERC,* 707 F.2d 1507, 1511 (D.C.Cir.1983). A showing that the agency has not considered relevant factors, examined alternative courses of action or made a rational policy choice can be sufficient. *See Bangor v. FERC,* 922 F.2d 861, 863–65 (D.C.Cir.1991); *Las Cruces TV Cable v. Federal Communications Comm'n,* 645 F.2d 1041, 1047 (D.C.Cir.1981); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). Gulf has made

that showing. FERC itself has acknowledged that the decision to deny Gulf a retroactive waiver in this case demands a "balancing of competing equities and interests." FERC Br. at 18, quoting *Columbia Gas* 750 F.2d at 109; *see also Wisconsin Elec. Power Co. v. FERC,* 602 F.2d 452, 457 (D.C.Cir.1979). Yet there is little evidence that FERC actually engaged in any meaningful balancing.

FERC asserts that denial of the retroactive waiver was necessary to give effect to its longstanding policy of strictly construing the FAC clause. Because it exercises reduced regulatory oversight of automatic adjustment clauses, the Commission perceives a danger that utilities might misuse the clauses to charge customers unwarranted higher rates. As a result, FERC has adopted a policy of strict interpretation of those clauses. The agency has, in the past, denied retroactive waivers "where the matters at issue were within a 'grey area' and the utility failed to take the necessary procedural steps to identify the proper treatment" of those matters. *Central Illinois Public Service Company,* 47 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 61,043 (1989).

We recognize FERC's strong interest in requiring utilities, in all instances, to seek advance approval for buyout-cost pass throughs. Utilities indeed should be discouraged from commencing pass throughs based on their own unchecked judgments about arrangements that will benefit customers. The Commission is properly concerned that a utility's projection of customer benefits may prove to be incorrect. FERC's advance review serves as a safeguard against situations in which customers must first pay an unjust rate and only later obtain redress in the form of a refund.

Nonetheless, while a penalty for Gulf's lapse may have been appropriate, a grossly excessive one was not. FERC's decision to penalize Gulf $2.7 million ignored several

---

**3.** Gulf does not challenge FERC's interpretation of Account 151 in *Kentucky Utilities,* that is, it does not dispute the Commission's ruling that

buyout costs cannot be automatically included in the FAC.

important considerations. First, in denying the retroactive waiver, FERC failed to take into account the significant extent to which Gulf's customers benefitted from the buyout. Saddled with long term contracts for the purchase of coal at prices above the market price, Gulf chose to negotiate an end to the unprofitable contracts and enter into new contracts at lower prices. It was not required to do so. Gulf could have kept its contracts in force and continued to pass their high cost to its consumers through high rates. Instead, Gulf chose to buy out the contracts and pass both the benefits and the costs on to consumers. The buyout produced approximately 4 million dollars in savings for Gulf's wholesale customers. *Gulf Power Co.*, 55 Fed.Energy Reg.Comm'n at ¶ 61,030. Of equal importance, Gulf received no windfall profit by passing on the buyout costs. Gulf recovered only the costs it had incurred in producing significant savings for its customers.

FERC acknowledges that one of the fundamental equitable principles of ratemaking is that costs should be borne by those who benefit from them. *See Pennsylvania Power & Light Co.*, 23 Fed.Energy Reg.Comm'n (CCH) ¶ 61,395 (1983); *Virginia Electric & Power Co.*, 15 Fed.Energy Reg.Comm'n (CCH) ¶ 61,052 (1981). Here, the buyouts undisputedly produced savings for Gulf's customers rather than windfall profits for Gulf. Equitable principles would seem to dictate that the customers should bear the costs of the buyouts. Nonetheless, FERC's order denying the retroactive waiver contains no indication that the Commission considered the savings the customers received or the lack of profit for Gulf. *See Gulf Power Company*, 55 Fed.Energy Reg.Comm'n at ¶ 61,030.

In addition, FERC did not explain why it had not taken the same position regarding retroactive waivers in similar circumstances in the past. After performing a routine audit in 1987, FERC informed Mississippi Power that it needed a waiver to pass through the costs of some of the same buyouts at issue here. Mississippi Power applied for a waiver on August 7, 1987.

The Commission approved the FAC treatment of the buyout costs and, on its own initiative, *granted a retroactive waiver* effective from January 1, 1987. *Mississippi Power Co.*, 41 Fed.Energy Reg.Comm'n (CCH) ¶ 61,004 (1987).

In *Concord v. FERC*, 955 F.2d 67, 75 (D.C.Cir.1992), this Court noted that "[c]ustomer refunds are a form of equitable relief, akin to restitution, and the general rule is that agencies should order restitution only when money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it." There, FERC declined to require refunds from a utility that had improperly charged its customers for spent nuclear fuel disposal under an FAC. The Commission concluded that the utility's minor error did not warrant imposition of a refund. *Id.* at 72.

*Minnesota Power & Light Co. v. FERC*, 852 F.2d 1070 (8th Cir.1988) presents a similar situation. As a result of litigation, the utility succeeded in reducing its transportation costs. When it passed the savings on to consumers, it also passed on the costs of the successful litigation. FERC ultimately determined that the litigation costs could not be passed on to customers through the FAC and disallowed a waiver, citing the need to protect customers from abusive rates. *Id.* at 1072–73. The Eighth Circuit rejected FERC's reasoning, noting that "without the waiver, MP & L will be denied the ability to recover the fees and expenses incurred and which result in saving MP & L ratepayers millions of dollars in fuel expenses." *Id.* at 1073. On remand, FERC granted the retroactive waiver.

■ The precedent established in *Minnesota Power & Light, Concord* and *Mississippi Power* requires FERC to give a better explanation for its broad refund order than it provided in this case. At the same time, we do not suggest that the Commission may never change its policy and must always treat similarly situated utilities in an identical fashion. We recognize that agencies must be given latitude to "adapt

their rules and policies to the demands of changing circumstances." *Permian Basin Area Rate Cases*, 390 U.S. 747, 784, 88 S.Ct. 1344, 1368–69, 20 L.Ed.2d 312 (1968). But when an agency takes inconsistent positions, as FERC did here, it must explain its reasoning. *Securities Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 207, 67 S.Ct. 1575, 1582–83, 91 L.Ed. 1995 (1947). FERC's order denying Gulf a retroactive waiver includes no discussion of its different treatment of Mississippi Power. In fact, in denying Gulf's petition for a rehearing, the Commission asserted, without adequately addressing its resolution of the cases discussed above, that its action here was consistent with its prior decisions on retroactive waivers. *Gulf Power Co.*, 55 Fed.Energy Reg.Comm'n ¶ 61,352 (1991).

In addition, in denying Gulf's application for retroactivity, FERC did not consider several alternative remedies available to it. FERC declared that denial of the retroactive waiver was necessary to provide an incentive for utility companies to adhere scrupulously to agency regulations. Nonetheless, several other remedies which also provide an incentive for adherence to the regulations are available. Those remedies appear to us to be more fairly proportional to Gulf's error.

For example, the agency could have assessed a civil penalty against Gulf for failing to file the waiver. Under the FPA, "any ... public utility which willfully fails ... to file any report required under this chapter or any rule or regulation ... shall forfeit to the United States an amount not exceeding $1,000 to be fixed by the Commission...." 16 U.S.C. § 825n(a). The Fifth Circuit approved the Commission's imposition of such penalty on a utility that is "plainly indifferent" to reporting requirements. *Alabama Power Co. v. FERC*, 584 F.2d 750 (5th Cir.1978) (citations omitted); *see also Utah Power & Light Co.*, 1 Fed.Energy Reg.Comm'n (CCH) ¶ 61,264 (1977). The Commission did not mention the civil forfeiture provision in its order nor did it explain at oral argument why it did not apply that provision to this case.

The Commission also failed to consider granting Gulf a partially retroactive waiver. FERC could have allowed the waiver to operate retroactively from January 1987 to December 1988 when it decided *Kentucky Utilities*. This remedy would have prevented Gulf from recovering only those buyout costs it passed through to customers after the Commission clearly declared its policy requiring a utility to obtain a waiver. Or the Commission could have allowed Gulf to recover the buyout costs retroactively from the middle of 1989 when the utility first applied for a waiver. This remedy would have given Gulf credit for its first, albeit unsuccessful, attempt to comply with FERC's requirements.

### IV. Conclusion

In sum, we cannot approve the penalty FERC imposed on Gulf. The Commission itself found that Gulf's buyouts produced significant ongoing benefits for its customers. Gulf produced these savings on its own initiative. Nonetheless, by denying a retroactive waiver, FERC forced Gulf to give its customers a windfall refund of $2.7 million dollars of buyout costs and interest in addition to the savings it had already provided them through reduced rates. The Commission took this action because Gulf failed to file a waiver request before beginning the pass through.

We acknowledge FERC's need to enforce strictly its regulations, especially pertaining to fuel adjustment clauses. We do not want to bind FERC and prevent the clear and expeditious application of Commission rules regarding the FAC. And we fully recognize the Commission's legitimate position that buyout costs cannot be passed through an FAC unless a utility passes the test laid out in *Kentucky Utilities* and obtains a waiver from the Commission. However, the sanction that FERC imposed here is clearly disproportionate to the error committed. In imposing this sanction, FERC failed to balance the equitable considerations the agency itself agrees are relevant to any FAC decision. Moreover, FERC failed to examine possible alternative sanctions that would have produced a result more proportional to Gulf's violation.

Accordingly, we conclude that FERC's decision to deny Gulf's request for a retroactive waiver was arbitrary and capricious and we vacate the part of the order that effects the denial. We remand to FERC for further consideration consistent with this opinion.

*It is so ordered.*